THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. McCORMICK KNOX, Defendant-Appellant.

(No. 71-106;

Second District—March 1, 1972.

Ralph Ruebner and Thomas Holum, of Defender Project, both of Elgin, for appellant.

Jack Hoogasian, State's Attorney, of Waukegan, for the People.

Mr. JUSTICE THOMAS J. MORAN delivered the opinion of the court:

Defendant was indicted for separate counts of murder and manslaughter arising out of the shooting of his wife, Clematee. He plead guilty to voluntary manslaughter, moved for probation which was denied and was sentenced to the penitentiary for a term of 8 to 15 years.

The record discloses that this was the second marriage for both McCormick and Clematee Knox who, for the better part of their 12 year marriage, lived together with 4 children of defendant's first marriage, 3 of the 5 children of his wife's first marriage and 3 children born of the second union. Many witnesses attested to defendant's good character, exemplary work habits, his reliability as a provider, his fairness in dealing equally with all the children of the household and his oft repeated assertion of love for his wife.

Within the last few years, the couple argued inordinately, the subject of the arguments apparently being Clematee's objections to defendant's children by his first marriage. Testimony established that Clematee, on repeated occasions, stayed away from the marital home overnight, received numerous phone calls from men, was seen in the company of another man on at least one occasion and once left her husband's bed during the night to be found in an auto in front of the home in company with her ex-husband. She quite commonly directed abusive and profane language at defendant, once hit him in the head with a pop bottle, during an altercation in front of the home sought to hit him with a 2 x 4, and

at another time went out after defendant with a pair of scissors in her hand threatening to kill him.

On at least five or six occasions she took leave of their home and for a brief time rented separate quarters. During the periods of her absence, defendant cared for the children, cooked, cleaned the apartment and did the laundry, in addition to working two full time jobs. This situation subjected him to ridicule and jibes from his friends and neighbors. Reconciliations were effected due to defendant's efforts, his pleadings and his repeated assertion of love for his wife. During one of Clematee's stays away from home, she refused to consider returning unless defendant's children were removed from the house. His eldest son already emancipated, defendant sent his three remaining children to stay with their natural mother in Cleveland. Clematee returned to the home. Her children and the couple's own children remained with them. When defendant's children subsequently returned to the area for a funeral, they remained briefly with their father but were later sent to live with an aunt, then a cousin and ultimately were moved into the apartment of their 19 year old brother.

During November, 1970, defendant suffered a one-week lay off and, during this period of short funds, incurred another argument with his wife stemming from his refusal to give money to her children. The record tells us only that Clematee called the police and we know that for 3 weeks prior to December 19th, defendant boarded at the home of a friend. During that time, however, he continued to support the family, maintained contact with the children of the household, permitted Clematee to continue using the single family car as transportation to and from her employment and, on December 17th and 18th, took his wife Christmas shopping for family gifts.

On Saturday morning, December 19th, defendant returned from his night job and parked his car in the lot of a neighborhood tavern. While he was seated in the car his wife approached, saying she needed the car. Defendant gave her the car keys and asked for some money for food. He was told to borrow money from his friends. During the day, defendant drifted about the city, stopping at his son's home, a tavern (where it was known that he had one beer), the homes of friends and the business establishment of another acquaintance. He succeeded in borrowing some money, bought some bologna and a soft drink which he consumed while standing behind a laundromat, and visited the Salvation Army store where he purchased a pair of shoes, sox and a shirt. He stopped at the home of the friend with whom he boarded and found that, in accordance with the usual custom, a group had gathered there

to play cards. Concerned about its theft by someone present, he removed his loaded gun from under his mattress and took it with him. This had been his practice during other weekends of his stay. On those occasions he had left the gun with other friends or placed it in the trunk of his car. This day he retained the gun in his coat pocket.

He repeatedly called his home during mid-afternoon, but his wife had not yet returned. When he finally got a busy signal, he walked to the home and, at approximately 6:00 P.M., was admitted by one of the children. His wife was still on the phone.

Here there is some discrepancy in testimony. Defendant asserts that it had been prearranged that he would pick Clematee up that evening to again go Christmas shopping; that he said, "Let's go," but that his wife, still on the phone, said she was not going anywhere with him, ultimately hung up after tussling with the telephone, threatened to call the police, and became abusive in her language, repeatedly swearing at defendant, calling him derogatory and obscene names in front of the children present.

The testimony of one of the children would seem to indicate that Clematee was unaware of any arrangement to go shopping, asking, "Where?" to defendant's demand of "Let's go." The same child testified that defendant grabbed the phone from his wife's hand, spoke to her sister-in-law, telling her to call back and hung up the phone. This defendant denied. At some point during the shouting, Clematee sent one of the children to get her coat, but the argument and her abusive language continued.

Defendant, standing at the back door, took the gun from his pocket, fired a single shot at his wife and left the apartment.

He stopped at a neighbor's house, leaving the gun and informing her that he had shot his wife and then proceeded to the police station where he surrendered.

Police officers and the warden of the county jail testified to defendant's polite cooperation, his apparent remorse and his behavior as a model prisoner.

Defendant's prior record consisted of one charge of driving while under the influence of intoxicating liquor and two charges of disorderly conduct, both resulting from his wife's complaints.

■■ The penalty for voluntary manslaughter is 1 to 20 years (Ill. Rev. Stat. 1969, Ch. 38, Sec. 9—2(c)). Supreme Court Rule 615(b)(4) grants the reviewing courts power to reduce the punishment imposed by the trial court. This rule, as well as its antecedent statute (Ill. Rev. Stat. 1965, Ch. 38, Sec. 121—9(b)(4)) has been interpreted by the Supreme

Court and the guidelines set by the Court in *People v. Taylor* (1965), 33 Ill.2d 417, 424 where, in quoting from *People v. Smith* (1958), 14 Ill.2d 95, 97, it stated:

"\* \* \* '[w]here it is contended that the punishment imposed in a particular case is excessive, though within the limits prescribed by the legislature, this court should not disturb the sentence unless it clearly appears that the penalty constitutes a great departure from the fundamental law and its spirit and purpose, or that the penalty is manifestly in excess of the proscription of section 11 of article II of the Illinois constitution which requires that all penalties shall be proportioned to the nature of the offense.' "

With few exceptions, the Supreme Court has adhered to this rule.

Section 11 of article II of the 1870 constitution (referred to within the rule) reads, in part:

"All penalties shall be proportioned to the nature of the offense \* \* \*."

Subsequent to the promulgation of the rule, and after sentence was pronounced herein, Illinois effected a new constitution (July 1, 1971). Therein, section 11 of article I reads:

"All penalties shall be determined *both* according to the *seriousness of the offense and with the objective of restoring the offender to useful citizenship* \* \* \*." (Emphasis added.)

■■■ Potential rehabilitation, always a matter to be considered at the time of sentencing, has been afforded specific constitutional recognition by virtue of the section quoted above. We are of the opinion that such recognition extends the guidelines previously expressed by our Supreme Court. In so saying, we are cognizant that the State is barred from seeking review of a sentence reduced by the intermediate reviewing court. (See, *People v. Kurtz* (1967), 37 Ill.2d 103, 110.) We weigh the responsibility of this fact while acknowledging that, for the purpose of imposing appropriate punishment, the trial court is ordinarily in a position superior to that of a court of review.

The offense herein is of the most serious nature. The trial court remarked at the time of sentencing that though the defendant had reached a breaking point due to the treatment received from the deceased, the circumstances did not justify, legally or morally, the taking of his wife's life. The court then "regretfully" pronounced the sentence appealed. Under his present minimum sentence of 8 years, and with the maximum time allowed for good behavior, defendant would be eligible for parole in 5 years and 3 months. With a similar allowance, the requested 3 year minimum would find defendant eligible for parole in 2 years and 6 months.

We review then the sentence given a man who, by holding two jobs,

had been the supporting father to a family of 10 children; who, except for minor misdemeanors had previously led a responsible existence and who was remorseful of the act committed.

■■ Considering both the seriousness of the crime and the objective of restoring the defendant to a useful citizenship, we feel it would be proper in this case to reduce the minimum sentence. It is hereby ordered that the minimum sentence be set at 5 years.

Judgment modified and as modified, affirmed.

SEIDENFELD, P. J., and GUILD, J., concur.